# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br>         Plaintiff, ) <br> vs. ) <br> ROBERT LAFON, ) <br>         Defendant. ) | Case No. 2:15-cr-00231-KJD-CWH <br><br> **REPORT AND RECOMMENDATION** |

This matter was referred to the undersigned magistrate judge on Defendant Robert Lafon's ("Lafon") motion to suppress evidence for Fourth and Fifth Amendment violations (ECF No. 20), filed October 27, 2015, the government's response (ECF No. 24), filed November 6, 2015, and Lafon's reply (ECF No. 25), filed November 10, 2015. The court conducted an evidentiary hearing on November 30, 2015. (Mins. of Proceedings (ECF No. 26).) Lafon filed a supplemental brief on the motion to suppress (ECF No. 29) on December 7, 2015, and the government responded (ECF No. 30) on December 11, 2015. The court conducted an additional hearing on December 17, 2015. (Mins. of Proceedings (ECF No. 32).)

## BACKGROUND

Las Vegas Metropolitan Police Department ("LVMPD") Officer Charles Yannis ("Officer Yannis") testified that at about 2:30 p.m. on July 30, 2015, while on patrol duty, he received a notice from dispatch that a 911 call had been received indicating that a man with a red shirt was passed out in a parked white Lexus vehicle with both a needle and a gun visible in the vehicle. Officer Yannis proceeded to the gated apartment complex where the Lexus was parked, and he met with a witness who indicated he had made the 911 call and that the man had a needle in his arm and a shotgun next to him in the vehicle. Based upon his experience as a patrol officer in that area for

12 years, Officer Yannis described the apartment complex, but not the overall neighborhood, as a "hot spot" of high crime with high drug activity. Officer Yannis quickly located, within the complex, a parked white Lexus with both front and back passenger doors open. Officer Yannis testified that he kept his distance, for officer safety, and saw a man wearing clothing matching the description given by the 911 call, standing outside of the vehicle. Officer Yannis saw the man put something into the vehicle through the rear passenger side door and then enter the Lexus and drive towards the entry of the complex. Officer Yannis followed, and immediately activated his lights and siren to stop the vehicle. Officer Yannis followed the vehicle out of the apartment complex and onto the adjacent road. He testified that he thought the Lexus pulled hastily out of the complex, but then it slowed down and pulled over about a quarter of a mile from the apartment complex. By this time, backup Officer Smith had arrived to provide assistance, also using his lights and siren.

Officer Yannis testified that he and Officer Smith conducted a "felony car stop" because the presence of a weapon had been reported. Officer Yannis conceded in cross examination that no felony had been committed, but the procedure was used to ensure officer safety. Both officers had their guns drawn, stayed behind the doors of the patrol car, and ordered the driver to exit the vehicle and to come towards them. The driver, eventually determined to be Lafon, complied. Officer Yannis testified that Lafon was immediately handcuffed for officer safety. Officer Yannis obtained Lafon's identification and learned that he had a prior felony conviction. Officer Yannis did not ask any questions of Lafon regarding his presence at the apartment complex. Medical assistance was provided to Lafon because of the report that he had previously had a needle in his arm. According to Officer Yannis, Lafon appeared to have medical issues and was slurring his words. Lafon has remained in custody since his arrest.

The officers continued to "clear the car" to ensure there were no other passengers, and there were none. The only door which was opened was the driver side door, and it was left open when Lafon exited. According to Officer Yannis, Officer Smith saw a shotgun in the Lexus. A photograph of the vehicle with the rear passenger side door open indicates that the shotgun was lying beneath and behind the passenger seat. The government did not provide any evidence

2

explaining how Officer Smith was able to see the shotgun without entering the vehicle. Officer Yannis testified that he later looked into the vehicle and saw a shotgun "standing up" in the back passenger seat.

Because the shotgun was observed, the officers summoned detectives who eventually obtained a search warrant for the vehicle. The warrant application notes the sighting of the shotgun after the traffic stop as well as the fact that Lafon is a convicted felon. The shotgun was located and seized from beneath the back passenger seat during the execution of the search warrant. Photographs of the vehicle and the shotgun were taken by investigators before the shotgun was moved.[1] *See* Exhibit B. Lafon moves to suppress all evidence in this case, including this shotgun as well as illegal drugs that were discovered in the car. After the detective arrived, Officer Yannis returned to the apartment complex and obtained a written statement from the 911 caller with whom he had spoken.

Detective G. Everett was a 10 year veteran of the Las Vegas Metropolitan Police Department, and had been a detective for about 3 years. He was summoned to the scene to obtain a search warrant of the stopped vehicle. When he arrived, he received a brief from the patrol officers at the scene, but he did not participate in the search of the vehicle. About one and a half hours later, he met Lafon at the Clark County Detention Center. Lafon was in custody in belly chains, and reportedly had been to the hospital. Detective Everett testified that Lafon did not appear to be under the influence of any drug, and seemed normal and casual. Detective Everett administered *Miranda* warnings from a card provided by Metro. The interview was recorded and transcribed, and it was provided as evidence at the hearing. After receiving *Miranda* warnings, Lafon ultimately admitted, among other things, that he had touched the weapon. Lafon also moves to suppress the statements made during the interrogation.

---

[1] Lafon noted that the metadata on the digital photographs provided in discovery indicated that they were taken at 6:18 p.m. The search warrant was approved at 6:31 p.m., and it therefore appeared that the vehicle was searched before the warrant was obtained. Officer Zach Beal testified that the camera date and time must have been in error because the photographs were not taken until after the search warrant was obtained.

On August 11, 2015, a federal grand jury returned an indictment against Lafon for a violation of 18 U.SC. §§ 922(g)(1) and 924(a)(2), Felon in Possession of a Firearm.  (Indictment (ECF No. 1).)

**DISCUSSION**

Lafon first argues that Officer Yannis had no warrant or other legal basis to stop him when he drove away from the apartment complex.  According to Lafon, the report of the witness was insufficient to create a reasonable suspicion that a crime had been committed because it is legal to possess a firearm, and it is legal to possess a hypodermic needle.  Lafon next argues that the officers exceeded the bounds of a *Terry* stop when they drew their weapons, handcuffed him, and arrested him without probable cause.  Lafon argues that all of the evidence seized, including the shotgun and the incriminating statements, were tainted by the illegal arrest, and must be suppressed.   Finally, Lafon argues that the statements that he made to Detective Everett should be suppressed because the *Miranda* warning was insufficient.

The government responds that law enforcement is entitled to rely upon anonymous tips as the basis for an investigative stop, and that the report made in this case carried sufficient indicia of reliability to justify the stop.  Additionally, the government argues that *Miranda* warnings received by Lafon were sufficient, and the waiver of those rights was clearly established.  Lafon replies that the witness statement failed to create suspicion of an ongoing and dangerous crime, and that the stop was based merely upon the officer's hunch.

The Fourth Amendment addresses "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United States*, 389 U.S. 347 (1967).  It "protects people, not places." *Id*. at 352.

Evidence obtained in violation of the Fourth Amendment and evidence derived from it may be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963). The exclusionary rule prohibits the introduction of evidence regarding tangible materials seized during an unlawful search as well as testimony concerning knowledge acquired during an unlawful search.  *Id.* at 485 (citing *Silverman v. United States*, 365 U.S. 505 (1961); *Weeks v. United States*, 232 U.S. 383 (1914)).  The exclusionary rule reaches not only primary evidence obtained as a direct

result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or "fruit of the poisonous tree." *Id.* at 484-85. Specifically, the exclusionary rule "extends as well to the indirect as the direct products" of unconstitutional conduct. *Id.* at 484.

For Fourth Amendment purposes, a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. State of Ohio*, 392 U.S. 1, 19, n.16; *see also United States v. Robert L.*, 874 F. 2d 701, 703 (stating that "when a law enforcement officer signals a motorist to stop by use of a siren or red light, there has been a seizure which must be justified under the Fourth Amendment." (quotation omitted).) The Fourth Amendment permits brief investigative stops, such as the traffic stop, when a law enforcement officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). The "reasonable suspicion" necessary to justify such a stop "is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990). The standard takes into account "the totality of the circumstances—the whole picture." *Cortez*, 449 U.S. at 417.

A reviewing court's determination of reasonable suspicion is a process that "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Cortez*, 449 U.S. at 418). The Fourth Amendment is satisfied if an officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot and observation of factors which are by themselves consistent with innocence, but may collectively amount to reasonable suspicion. *Id*. at 273-74. Reasonable suspicion is not a matter of hard certainties, but of probabilities. *Cortez*, 449 U.S. at 417-18. However, reasonable suspicion requires more than an officer's "hunch" even if the hunch later turns out to be a good one. *Terry v. Ohio,* 392 U.S. 1, 27 (1968). The reasonable suspicion standard is less than a preponderance of the evidence. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

///

1    Here, there is no question that Lafon was seized during the "felony car stop," which was
2    initiated when Officer Yannis activated his lights and siren in the apartment complex. Thus, his
3    reasonable suspicion of wrongdoing had to exist at the time he initiated the stop. *United States v.*
4    *Fouche*, 776 F.2d 1398, 1402 (9th Cir. 1985). Other than the information provided by the witness,
5    and his belief that the apartment complex was a "hot spot" of crime, Officer Yannis provided no
6    reason to stop the vehicle. He did not see anything in the vehicle, and did not witness a traffic
7    infraction before he turned on his lights and siren. Indeed, Officer Yannis did not testify as to any
8    facts he perceived from the time he initiated the traffic stop in the apartment complex to the time
9    the Lexus was pulled over a quarter of a mile from the complex that would have given him a
10   reasonable suspicion to conduct a stop. Although Officer Yannis testified he saw Lafon put
11   something into the Lexus through the rear passenger door while the Lexus was parked in the
12   apartment complex, Officer Yannis testified he could not see what it was. The issue in this case,
13   then, is whether the investigative stop was justified based upon information Officer Yannis knew at
14   the time that he initiated the stop.

15   The government relies on *Navarette v. California*, 134 S. Ct. 1683, 1688 (2014), where the
16   court held that under appropriate circumstances, an anonymous tip[2] can demonstrate "sufficient
17   indicia of reliability to provide reasonable suspicion to make [an] investigatory stop." The Ninth
18   Circuit summarized the salient factors of *Navarette*, emphasizing four points:

> (1) the caller claimed eyewitness knowledge of the alleged dangerous activity, lending 'significant support to the tip's reliability,' . . . (2) the caller made a statement about an event 'soon after perceiving that event,' which is 'especially trustworthy,' . . . (3) the caller used 911, which 'has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity,' . . . and (4) the caller created reasonable suspicion of an ongoing and dangerous crime . . . rather than 'an isolated episode of past recklessness.'

---

[2] Assuming that the witness in this case was initially anonymous because he made the 911 call, he was later identified by Officer Yannis. A tipster is not "anonymous" if the information provided by him or her is sufficient to narrow the likely class of informants such that the tipster could be held accountable for any fabrications. *See United States v. Terry-Crespo*, 356 F.3d 1170, 1174 (9th Cir. 2004).

6

1  *United States v. Edwards*, 761 F.3d 977, 984 (9th Cir. 2014).  Here, Lafon concedes the first three
2  factors, but argues that the information possessed by Officer Yannis did not create a reasonable
3  suspicion of an ongoing and dangerous crime.  In other words, it is the content of the information
4  received from the witness, and not its reliability, which Lafon believes was insufficient.

5  Officer Yannis testified that he conducted the felony car stop because he believed that there
6  was a shotgun in the vehicle and was concerned about officer safety.  Lafon correctly points out
7  that responsible citizens may bear arms outside the home for the lawful purpose of self-defense.
8  *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1175 (9th Cir. 2014).  In Nevada, it is legal to openly
9  carry a shotgun in a car.  *See, e.g.,* Nev. Rev. Stat. § 503.165 (prohibiting only carrying a loaded
10  shotgun in a vehicle).  Simple open possession of a firearm, without more, is insufficient to justify
11  an investigative detention.  *See also Florida v. J.L.*, 529 U.S. 266, 272 (2000) (declining to adopt a
12  "firearms exception" that would give police officers broader license to investigate tips alleging
13  illegal guns than would ordinarily be possible under *Terry'*s reasonable suspicion standard).

14  The witness's report to Officer Yannis that Lafon had a needle in his arm[3] does not create
15  reasonable suspicion that a crime has been committed.  Possessing or using hypodermic needles is
16  not a crime.  *See* Nev. Rev. Stat. § 454.480(2) (stating that "[h]ypodermic devices which are not
17  restricted by federal law to sale by or on the order of a physician may be sold or furnished without a
18  prescription").  The witness provided no information which related the use of the needle to the
19  illegal use of drugs, for example, by reporting a suspected drug sale or seeing illegal contraband.
20  Officer Yannis did not testify that he suspected that the needle was used to inject illegal narcotics,
21  but even if he did believe that, he conceded during cross examination that Lafon could have been a
22  diabetic, inferring that the use of the needle could be lawful.  People may lawfully use hypodermic
23  devices in "hot spots," or high crime areas.  Without more, the inference that Lafon was using
24  illegal drugs with the hypodermic needle is no stronger than the inference that Lafon was using
25  insulin to treat diabetes.  To find otherwise would mean that every possession of a hypodermic

---

[3] The court notes that the search warrant in this case indicated only that the witness saw a hypodermic needle in Lafon's hand, not "in his arm."

1  needle would create reasonable suspicion of illegal drug use, and would justify seizure of its
2  possessor.  This court rejects such a finding for the same reason that the Court in *Florida v. J.L.*
3  refused to adopt a "firearms exception" that would give police officers broader license to
4  investigate tips alleging illegal guns than would ordinarily be possible under *Terry'*s reasonable
5  suspicion standard.

6  In summary, at the time that the traffic stop was initiated, Officer Yannis reasonably
7  believed that Lafon possessed a shotgun and a hypodermic needle in a vehicle located in a "hot
8  spot" of crime.  Neither a suspected "ongoing and dangerous crime," nor any other crime was
9  identified by Officer Yannis.  *See Edwards*, 761 F.3d at 984.  Accordingly, the court finds that
10 while the eyewitness information provided to Officer Yannis was reliable and accurate, it did not
11 provide "a particularized and objective basis for suspecting the particular person stopped of
12 criminal activity." *Cortez*, 449 U.S. at 417-18.  There is no question that police must take 911 calls
13 seriously, and the results of the stop showed that Officer Yannis apparently had a good "hunch" of
14 criminal activity.  But reasonable suspicion requires more than an officer's "hunch," even if the
15 hunch later turns out to be a good one. *Terry*, 392 U.S. at 27.

16 In this case it was not reasonable under the Fourth Amendment to stop Lafon's vehicle.
17 The shotgun and narcotics related evidence which were seized from the car were discovered as the
18 result of the unreasonable stop of Lafon's vehicle.  The search warrant clearly relied on the
19 officer's observation of the shotgun to justify the search and seizure, and was therefore tainted by
20 information obtained during the unreasonable stop.  Accordingly, all evidence seized in this case,
21 including the shotgun, narcotics related evidence, and testimony concerning knowledge acquired
22 during the unlawful search will be suppressed.  *See Wong Sun*, 365 U.S. at 485 (stating that the
23 exclusionary rule prohibits the introduction of evidence regarding tangible materials seized during
24 an unlawful search as well as testimony concerning knowledge acquired during an unlawful
25 search).

26 Lafon was arrested and never released from custody.  But for the illegal stop, evidence of
27 Lafon's possession of a firearm, narcotics, and paraphernalia would not have been discovered, and
28 there was therefore no probable cause for his arrest.  A confession obtained through custodial

interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is "sufficiently an act of free will to purge the primary taint." *Taylor v. Alabama*, 457 U.S. 687, 690 (1982) (quotation omitted). The government did not present evidence demonstrating such an intervening event occurred. The results of the Lafon's interrogation are "fruits of the poisonous tree," and will be suppressed.[4]

### RECOMMENDATION

Accordingly, **IT IS HEREBY RECOMMENDED** that Lafon's motion to suppress evidence for Fourth Amendment violations (ECF No. 20) be **granted**.

### NOTICE

This report and recommendation is submitted to the United States District Judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation may file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the District Court's Order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED: December 23, 2015

_____
**C.W. Hoffman, Jr.**
**United States Magistrate Judge**

---

[4] Because the evidence is suppressed based upon the unreasonable stop, the court expresses no opinion regarding the arguments that Lafon was arrested without probable cause, or the sufficiency of the *Miranda* warnings.

9